UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SPECTRUM COMMUNICATION       CIVIL ACTION
SPECIALISTS, L.L.C.

VERSUS                        NO. 09-159

KMJ SERVICES, INC. AND        DIVISION "3"
BRAD BLANCHARD

### ORDER AND REASONS

On June 20, 2011, the Court conducted a one-day bench trial in the above-captioned lawsuit. Present were Robert J. Stefani, Jr. and William Boyles on behalf of plaintiff Spectrum Communication Specialists, L.L.C. ("Spectrum"). Also present were David Ardoin and Preston Hayes on behalf of defendants KMJ Services, Inc. ("KMJ") and Brad Blanchard (collectively, "defendants"). Following the day-long bench trial, the Court took the matter under advisement. Having reviewed the testimony, the pre-trial memoranda, the evidence, the case law, the proposed findings of fact and conclusions of law and the parties' arguments, the Court rules as follows.

**I.    Procedural Background**

On January 20, 2009, Spectrum sued defendants, alleging breach of contract, unjust enrichment, alter ego and for attorneys' fees and costs in connection with the alleged breach of an Operating Agreement ("the Agreement") related to the vessel the M/V MISS ELIZABETH. At the time the parties proceeded to trial, Spectrum sought $102,212.97 due and owing it under the Agreement.

In their answer, defendants denied that Spectrum sustained any damages as alleged in its complaint and responded that Spectrum had "failed to exercise reasonable care and diligence to prevent avoidable consequences of this damage, resulting in a failure to mitigate [its] damage . . ." [Doc. #7 at p. 6]. Defendants also responded that the Agreement attached to plaintiff's complaint is not the governing Agreement between the parties and that defendant breached no contractual or legal duty owed to Spectrum. Further, defendants asserted a counterclaim against Spectrum, arguing that they are entitled to a set-off for the out-of-pocket expenses, maintenance costs, crew costs and any other related costs incurred in their operation of the vessel. At the time the parties proceeded to trial, defendants argued that Spectrum owed them $10,967.93.

On April 12, 2011, the parties consented to proceed before the undersigned. As noted above, on June 20, 2011, the undersigned conducted a one-day bench trial.

## II.  Findings of Fact

At all times relevant to the dispute underlying this lawsuit, Spectrum was the owner of the vessel the M/V MISS ELISABETH ("the vessel"). On April 16, 2007, Spectrum and KMJ entered the Agreement under which KMJ assumed the management and operation of the vessel. (Pl.'s Ex. 1 at § 6). For its services under the Agreement, KMJ was to be paid eight per cent (8%) "for each day Vessel is working." (*Id.* at § 4). KMJ was to deduct the eight-per cent fee from the invoices billed by it. (*Id.*). The Agreement also provided that

> [w]ith regard to expenditures associated with the operation of the Vessel including but not limited to payroll, maintenance and any other expenses incurred by Operator to keep Vessel in legal and good operating condition, at sole discretion of Operators, said cost of operations to Vessel will be deducted from invoice billed by Operator for Owner's Vessel.

(*Id.*). In short, KMJ was to be reimbursed the expenses incurred to keep the vessel in "legal and good operating condition" by deducting the costs of the expenses from the invoices that it billed. (*Id.*).

The Agreement had an effective date of March 10, 2007. (*Id.* at p. 1). KMJ operated the vessel from March 10, 2007 through October 17, 2007. Between April 23, 2007 and August 16, 2007, David Rice, Spectrum's Director of Operations, repeatedly telephoned and sent e-mails to KMJ in which he requested reporting on the vessel's operations and financial performance. (Pl.'s Exs. 17, 18 & 21). On June 20, 2007, Rice received an e-mail from KMJ's chief financial officer, Ryan Vidal, that partially reported on the vessel's financial performance. (Pl.'s Ex. 19). This was the only financial information that KMJ provided to Spectrum during the time that KMJ operated the vessel. The financial statement reflected a loss of approximately $139,000.00, and this loss concerned Rice. (*Id.*; Testimony of Rice.) On August 3, 2007, Rice drove from Houston, Texas to Cut Off, Louisiana to attend a scheduled meeting with Brad Blanchard, President of KMJ. (Pl.'s Ex. 21). Blanchard failed to attend the meeting. (*Id.*). Blanchard testified that he was ill and could not attend the meeting. (Testimony of Brad Blanchard). Rice later tried to meet again with Blanchard to no avail when Rice had business in Fourchon, Louisiana. (Testimony of Rice).

Ultimately, Spectrum hired counsel, Robert Stefani, to communicate with KMJ concerning the vessel's financial performance. On September 7, 2007, Stefani sent a letter to Blanchard in which he demanded an audit of KMJ's books and records that related to the vessel. (Pl.'s Ex. 23). Brent Burley, KMJ's attorney, then instructed Stefani to communicate to KMJ only through him. On September 18, 2007, Stefani sent a letter to Burley in which he informed KMJ of Spectrum's 30-

day written notice of its intent to terminate the Agreement. (Pl.'s Ex. 24). Notwithstanding Spectrum's right to terminate the Agreement with 30 days written notice and KMJ's obligation to return the vessel after 30 days notice, KMJ refused to communicate the location of the vessel to Spectrum or to coordinate the vessel's return. (Pl.'s Ex. 1 at § 3; Testimony of Rice). Neither did KMJ provide further financial information to Spectrum, including back-up invoices that evidenced vessel expenses. (Testimony of Rice). Because Rice's brother, Gordon Rice, was a consultant with KMJ at the time of the events here, Vidal testified that he thought that any communication between Gordon Rice and himself concerning the financial performance of the vessel was sufficient. (Testimony of Blanchard and Ryan Vidal).

On October 8, 2007, KMJ forwarded a spreadsheet that detailed summary financial information for the vessel but did not provide any back-up documentation for the information in the spreadsheet. (Pl.'s Ex. 28; Testimony of Rice). Seven days later, Stefani received a disc from Burley. (Pl.'s Ex. 30). Burley represented that the disc contained the raw data to back-up the summary financial information on the spreadsheet. (*Id.*). The disc, however, contained only a recording from a radio talk show that addressed weight-loss issues. (*Id.*). Stefani advised Burley that Rice was willing to stop by Burley's office to pick up the correct disc, but Burley declined the offer and informed Stefani that he would forward the information from KMJ directly to Rice. (Pl.'s Ex. 33). KMJ forwarded neither the disc nor the other requested back-up information to Spectrum or its counsel. (Testimony of Rice).

On October 16, 2007, Burley e-mailed Stefani to indicate that Blanchard wanted to discuss a six- or 12-month bareboat charter of the vessel and to advise Spectrum that the vessel was "on a

4

job" for Devon Energy. (Pl.'s Ex. 33). Burley asked Stefani to ask Rice if he wanted the vessel to remain on the job for Devon Energy under the existing contract until the end of the month. (*Id.*). Spectrum declined the offer and asked KMJ ro return the vessel. (*Id.*). KMJ still failed to advise Spectrum of the location of the vessel or to agree to a re-delivery location. (Testimony of Rice).

The next day, October 17, 2007, and at the end of the 30-day notice period, KMJ informed the crew of the vessel that their employment with KMJ was terminated and instructed them to remove all Coast Guard and other documentation from the vessel. (Def.'s Ex. 11; Testimony of Rice). Spectrum could not operate the vessel without the Coast Guard and other documentation. On that same date, Spectrum contacted the crew and took over possession and operation of the vessel. (Pl.'s Ex. 14; Testimony of Rice).

On December 6, 2007, Stefani wrote Burley to advise him that KMJ had still failed to provide Spectrum with the requested information concerning the operations and the financial performance of the vessel, including documentation that addressed a generator failure that had occurred aboard the vessel on August 20, 2007. (Pl.'s Ex. 35). On December 10, 2007, Vidal sent Blanchard and Burley a profit-and-loss statement ("the December 2007 Statement") that indicated that KMJ owed $30,999.93 to Spectrum as a result of KMJ's operation of the vessel under the Agreement. (Pl.'s Ex. 36). Spectrum received the December 2007 Statement on December 12, 2007. (*Id.*; Testimony of Rice). KMJ never paid the amount to Spectrum. (Testimony of Rice and Vidal).

The December 2007 Statement included:

(1)     $10,916.00 for insurance on the vessel;

(2) $18,282.00 in wages for crewmembers before the March 10, 2007 effective date of the Agreement;

(3) $7,313.00 in health insurance costs for personnel who were not members of the crew;[1]

(4) invoices in the amount of $16,172.50 for services by and supplies from Rice Electronics that KMJ had never paid; and

(5) $55,166.90, the entire amount for the cost to repair the generator.

(Pre-Trial Order, Other Matters, Part XVI, ¶ B; Exs. A-D to Dep. of Pegeen Larosa; Testimony of Vidal and Rice).

As noted above, under the Agreement, the operation, navigation and management of the vessel was under the exclusive control of KMJ and its servants, master and crew. (Pl.'s Ex. 1 at § 6). Section 7 of the Agreement required KMJ to "maintain the Vessel in the same good order and condition as when received, ordinary wear and tear expected [sic], and [to] cause all necessary repairs to be made." (*Id.* at § 7). Also as noted above, a generator aboard the vessel failed on August 20, 2007.

Because the first estimate to repair the generator totaled approximately $31,000.00 and KMJ's insurance policy had a deductible of approximately $25,000.00, Blanchard testified that he had initially declined to report the claim to the insurance company. (Testimony of Blanchard).

---

[1] At trial, KMJ, through the testimony of Blanchard, agreed that the costs for health insurance for Arlen Authement, Heather Peterson, Corey Autin, Larry Bevans, Robert Casson, Tammy Casson, Todd Babin, Craig Griffin, Vickie Lee, Terral Pitre and Helena Savoy should not be charged to Spectrum because they were not crewmembers of the vessel. (Testimony of Blanchard).

Accordingly, after the generator failed, Blanchard informed Vidal that KMJ would not submit the claim to the insurer and would bear the cost. (Testimony of Vidal and Rice). When Vidal prepared the December 2007 Statement, however, Blanchard instructed him to charge the expense to Spectrum, and Vidal did so. (Testimony of Vidal). KMJ ultimately charged Spectrum the $55,166.90 repair bill as an expense on the December 2007 Statement. (Pl.'s Ex. 36).

After KMJ declined to report the generator failure to the insurance company, Spectrum did so. (Pl.'s Ex. 35). Even after Spectrum had reported the generator failure to its insurer, KMJ failed to provide to Spectrum documents to support the claim. (*Id.*; Testimony of Rice). Timothy Anselmi, the insurance adjuster's surveyor, testified that the generator broke down because a bolt failed and caused a catastrophic loss of lubrication. (Dep. of Timothy Anselmi at p. 13). Anselmi also testified that the bolt was not subject to wear and tear. (*Id.* at pp. 17-19).

KMJ's insurer ultimately issued a check jointly to KMJ and Spectrum in the amount of $29,297.40 (after deduction of the deductible) for repairs to the generator. (Testimony of Rice). Spectrum asked KMJ to endorse the check so that it could cash it. (*Id.*). KMJ refused to endorse the check. (*Id.*). Spectrum could thus not cash the check while KMJ continued to seek recovery of the full cost of the generator replacement. (*Id.*). KMJ ultimately relented and delivered the endorsed insurance check to Spectrum but not until after Spectrum had sued KMJ. (*Id.*).

After Spectrum sued KMJ here, KMJ made further adjustments to the December 2007 Statement. KMJ allegedly restated the revenue set forth in the December 2007 Statement by making downward adjustments of $50,185.00 to account for payments by its customers that were less than the invoiced amount. (Pl.'s Ex. 6). Vidal testified that in its ordinary business practice, KMJ makes

7

no downward adjustments to invoices sent to its customers. Vidal ultimately left KMJ, and Blanchard hired Michael J. Waguespack, a certified public accountant, "to clean up the [accounting] mess" that Vidal left behind. (Testimony of Blanchard).

Waguespack turned to the source documents to clean up the books. (Testimony of Waguespack). He reconciled the checking accounts on a monthly basis, compared bank statements to the general ledger and performed cash-basis accounting. (*Id.*). Waguespack verified deposits (generated income) in the amount of $823,112.27 and expenses in the amount of $811,352.00. (*Id.*). After a downward adjustment for a reimbursement for hull insurance in the amount of $43,120.78, Waguespack calculated KMJ's eight-per cent fee at $65,849.98. (*Id.*). After the reimbursement for hull insurance, Waguespack determined that Spectrum owed KMJ a total of $10,967.93. (*Id.*).

Waguespack also includes the following in his calculation of amounts alleged to be due KMJ:

(1) $2,500.00 in professional fees of Cary Cheramie (Pl.'s Ex. 1; Testimony and Report of Waguespack);

(2) Health Insurance Costs of $16,344 for persons who were not crewmembers of the vessel as reflected by vessel logs and payroll records;[2]

(3) $18,282 in labor costs for periods before the effective date of the contract (Pl.'s Ex. 1, Testimony of Waguespack); and

(4) the $55,166.90 cost of the generator failure (Testimony of Waguespack; Defs.' Ex. 14).

---

[2] As noted *supra* in footnote 1, KMJ stipulated at trial that this amount was improperly charged to Spectrum.

After the deduction of these charges, and accepting all other calculations of Waguespack as correct, Spectrum calculates that KMJ still owes it the sum of $102,212.97, broken down as follows:

| | |
|---|---|
| Amount owed KMJ according to Waguespack's Report: | -$10,967.93 |
| Deduction of discounts to KMJ invoices to customers not properly taken under the Agreement: | $50,185.00 |
| Deduction of Cost of Professional Fees of Cary Cheramie not properly chargeable to Spectrum under the Agreement: | $2,500.00 |
| Deduction of health insurance premiums for non-crewmembers: | $16,344.00 |
| Deduction of crew costs prior to contract commencement: | $18,282.00 |
| Deduction of cost of generator repair not chargeable to Spectrum under the Agreement: | $55,166.90 |
| Addition of insurance payment received by Spectrum: | -$29,297.00 |
| Net Due Spectrum: | $102,212.97 |

## III. Conclusions of Law

Courts interpret maritime contracts as they do other contracts, by looking first to the intent of the parties as expressed by the terms of the agreement. *See, e.g., Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) (re-affirming that courts should look first to the expressed intent of the parties when interpreting indemnity clauses); *see also* 22 Williston on Contracts § 58:9

9

(4th ed.).³  Words should be given "their plain meaning unless the provision is ambiguous." *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984). A maritime contract "should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Fontenot*, 791 F.2d at 1214. If the language of the contract is ambiguous, a court may consider extrinsic evidence to determine the intention of the parties at the time of the contract. *Atl. Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 730 (5th Cir. 1975). Having reviewed the Agreement, the Court finds that the terms of the Agreement here are unambiguous, and neither party truly argues the ambiguity of the Agreement's provisions.

Spectrum argues that KMJ breached the Agreement in numerous ways, only one of which does the Court find convincing. Spectrum first asks the Court to find that KMJ breached the Agreement by failing to cooperate with Spectrum in the re-delivery of the vessel after Spectrum exercised its right to terminate the Agreement. But the facts do not support such a legal conclusion. Spectrum exercised its right to terminate the Agreement with 30 days notice on September 18, 2007. (Pl.'s Ex. 24). On October 17, 2007, KMJ informed the crew of the vessel that their employment with KMJ was terminated (Def.'s Ex. 11; Testimony of Rice), and, on that same date, Spectrum contacted the crew and took over possession and operation of the vessel. (Pl.'s Ex. 14; Testimony of Rice). Accordingly, at the end of the 30 days after which Spectrum terminated the Agreement, KMJ relinquished control of the vessel to Spectrum. While KMJ may not have informed Spectrum of the location of the vessel during the 30 days nor agreed on a location for re-delivery, the only fact

---

³ The jurisdiction of this Court is premised on 28 U.S.C. § 1333.

supported by a preponderance of the evidence in the record reveals that Spectrum regained possession and control of its vessel at the end of the 30-day notice period.

Spectrum also contends that KMJ breached the Agreement "[b]y failing to communicate with Spectrum during KMJ's management of the Vessel under the Agreement," "[b]y failing to provide financial and other information as required by the Agreement during the course of its management of the vessel" and "[b]y failing to properly account to Spectrum for the financial performance of the Vessel." [Doc. #88 at p. 11]. Try as it might, however, this Court can find no provision of the Agreement that explicitly required KMJ to do so. While it may be the customary practice in the industry to communicate such information between parties, that does not mean that the failure to communicate constitutes a breach of a bargained-for agreement that contains no express provision to do so.

Spectrum also asks the Court to find that KMJ breached the Agreement "[b]y failing to properly supervise the captain and crew of the vessel" and "[b]y refusing to submit the insurance claim for the generator failure." [*Id.*]. Both of these arguments relate to the failure of the generator. The Court can not find that KMJ breached *the Agreement* by failing to properly supervise the crew or to submit the insurance claim for its repair. As noted above, there is simply no provision in the Agreement that requires KMJ to do so.

Notwithstanding the foregoing conclusions, and as detailed below, the Court finds that KMJ breached the Agreement by charging Spectrum amounts that were the obligation of KMJ under the Agreement, and, in addition, that the unambiguous language of the Agreement and the preponderance of the evidence supports some of Spectrum's claims to a reimbursement of such

amounts. First, and to dispense with a formality, with regard to the $10,967.93 that Spectrum owes KMJ, the Court notes that Spectrum essentially concedes that it owes the amount to KMJ; that is why a reduction in the amount of its damages is included. [Doc. #88 at p. 10].

With regard to the professional fees of Cary Cheramie, the Court finds no support for such charges by KMJ to Spectrum in the evidence in the record.

As to the $16,344.00 charged to Spectrum for health insurance premiums for non-crewmembers, this issue resolved itself at trial when the parties stipulated that Arlen Authement, Heather Peterson, Corey Autin, Larry Bevans, Robert Casson, Tammy Casson, Todd Babin, Craig Griffin, Vickie Lee, Terral Pitre and Helena Savoy were not crew members but other employees of KMJ. Accordingly, Spectrum is entitled to a reimbursement for the health insurance premiums.

With regard to the $18,282.00 that Spectrum seeks in reimbursement for costs of the crew before the effective date of the Agreement, the Court finds that Spectrum is entitled to the reimbursement. While the Court notes that the testimony at trial supported KMJ's contention that the crew was necessary before the effective date of the Agreement to ready the vessel and to obtain the Coast Guard Certificate of Inspection, nothing in the unambiguous Agreement allows KMJ to charge Spectrum for the costs of the crew before March 10, 2007. Because the Court has found that the Agreement is unambiguous, extrinsic testimony – such as the testimony of Blanchard that the crew was necessary before the Agreement's effective date – can not alter the plain terms of the Agreement.

As to the $50,185.00 that Spectrum seeks because KMJ discounted invoices to customers, the Court finds no evidence in the record to support such an amount nor Spectrum's entitlement to

receive such damages. Spectrum cites its Exhibit 6 and the testimony of Todd Babin, KMJ's operations manager, to support the numerical figure. While Exhibit 6 reveals that KMJ reduced six invoices, neither figure for the reduction totals $50,185.00. (Pl.'s Ex. 6). Exhibit 6 reveals two totals, $57,959.65 and $69,644.61, neither of which is, obviously, $50,185.00. (*Id.*). In addition, no combination of any of the reductions totals $50,185.00. The Court is simply at a loss as to how Spectrum calculated the latter figure. Moreover, Todd Babin did not testify at the trial nor is his deposition in the record that the Court possesses.[4]

Spectrum argues that "reducing revenues by such deductions are in violation of the Agreement, which provides that Vessel expenses are to be deducted from 'invoice billed' to KMJ's customers, not receipts on those invoices." [Doc. #88 at ¶ 40]. But this argument makes no sense. That expenses may be deducted only from the invoice billed does not prove that Spectrum is entitled to the reductions that KMJ included on several of the invoices. There is no evidence in the record that KMJ deducted expenses from the reductions or calculated its eight-per cent fee according to the entire amount billed on the invoice (and not the reduced amount) before reducing the invoiced amount. In such a case, Spectrum would have a valid argument and would be entitled to a return of the amount of expenses that KMJ calculated under the reductions or the inflated eight-per cent fee. But Spectrum does not make this argument. Accordingly, from the evidence before it, the Court can not find that Spectrum is entitled to the $50,185.00.

---

[4] Should Spectrum seek a new trial or reconsideration of any part of this Order, Spectrum shall point to specific exhibits in the record to support the financial figures that it seeks. It is inconsistencies like this from the evidence in the record – *i.e.*, the $50,185.00 amount – that has impeded this Court's resolution of this dispute.

Lastly, the Court finds that Spectrum has failed to prove by a preponderance of the evidence that the negligence of the vessel's crew caused the failure of the generator. The only evidence to which Spectrum cites the Court is the deposition of Timothy Anselmi, who testified that (1) the generator broke down because a bolt failed and caused a catastrophic loss of lubrication, (Dep. of Timothy Anselmi at p. 13); and (2) the bolt was not subject to wear and tear. (*Id.* at pp. 17-19). Simply put, that the bolt was not subject to wear and tear does not prove that the crew of the vessel was negligent.

Notwithstanding this finding, Section 7 of the Agreement required "[KMJ], *at the cost and expense of [Spectrum]*, to maintain the Vessel in the same good order and condition as when received, ordinary wear and tear expected [sic], and [to] cause all necessary repairs to be made." (Pl.'s Ex.7 at § 7) (emphasis added). In other words, the owner – Spectrum – bears the costs to maintain the vessel in good order and also the costs of repairs. Hence, without a preponderance of the evidence to support any negligence on the part of the vessel's crew, the Court finds that Spectrum must bear the cost of the repairs to the generator.

## IV. Conclusion

Accordingly, and for the reasons outlined above, the Court finds that KMJ breached the Agreement as noted above and that Spectrum is entitled to the following damages:

| | |
|---|---|
| Deduction of Cost of Professional Fees of Cary Cheramie not properly chargeable to Spectrum under the Agreement: | $2,500.00 |
| Deduction of health insurance premiums for non-crewmembers: | $16,344.00 |

14

| | |
|---|---|
| Deduction of crew costs prior to contract commencement: | $18,282.00 |
| Net Due Spectrum: | $37,126.00 |

As noted above, the Court also finds that KMJ is entitled to $10,967.93.

Accordingly, after the deduction of the amount owed to KMJ, Spectrum is entitled to $26,158.07. KMJ and Brad Blanchard are thus jointly and severally liable to Spectrum in the amount of $26,158.07.[5]

In addition, because the Court finds that KMJ breached the Agreement and that Spectrum is entitled to damages as outlined above, the Court finds that KMJ is the losing party and that Spectrum is entitled to its reasonable expenses and attorneys' fees under the Agreement. (Pl.'s Ex. 1 at ¶ 15(b)). Spectrum shall submit an itemized statement of its expenses, including its attorneys' fees, for this Court to make a specific monetary award as to the amount of expenses, including attorneys' fees, due from KMJ to Spectrum.

Spectrum contends that it is entitled to interest pursuant to Louisiana Civil Code article 2000, which provides in relevant part, "When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500." La. Civ. Code art. 2000. However, as noted above, this is a maritime action under federal law, and this Court's jurisdiction is premised on 28 U.S.C. § 1333. There is thus no evidence in the record – nor case law cited by the parties – that would support a grant of interest under Louisiana

---

[5] The parties stipulated that Blanchard is personally liable for any judgment cast against KMJ in this lawsuit. [Doc. #86 at § XVI(A)].

law.  Should Spectrum seek interest, Spectrum shall file a memorandum that addresses what law governs the recovery of interest here and when that interest began to accrue **no later than fourteen (14) days from the date of this Order**.  KMJ shall have the opportunity to respond to Spectrum's memorandum **no later than fourteen (14) days from the filing of Spectrum's memorandum**.

    New Orleans, Louisiana, this 23rd day of November, 2011.

                                    **DANIEL E. KNOWLES, III**
                                    **UNITED STATES MAGISTRATE JUDGE**